Good morning everyone. We're ready to proceed. Our first case is BBL, Incorporated v. City of Angola. Mr. Hoffer. Good morning, Your Honors. May it please the court, Matthew Hoffer on behalf of the Plaintiff Appellants BBL Inc., Alva Butler and Sandra Butler. The court is presented in this case with a circumstance that was not presented before the Supreme Court either in City of Renton v. Playtime Theaters or Los Angeles v. Alameda Books. That is when the plaintiffs announced the intention to open Showgirl in the City of Angola, Showgirl was already prepared for just such a zoning regulation specifying where an adult business could operate in the City of Angola. The current city ordinance at the time that Angola arrived in August of 2012 specified that sexually oriented businesses, which I'll generally refer to as adult businesses, were required to open and operate in the C2 zoning classification. Appended to this ordinance was section 5.66, the sexually oriented business use standards, which specifically stated that for the health, safety, and welfare of the community that these businesses would be segregated a thousand feet from specified uses including residential districts, public gathering places, schools, and alike. Now when the plaintiffs actually announced their intent to operate in town, rather than having the calm that comes with being prepared, the City of Angola went into a panic and within four days it instructed its city attorney to begin researching the legalities of regulating adult businesses and within a month they had passed the licensing and regulatory ordinance, which I will refer to as the zoning administrator or something like that. Didn't the attorney, he was aware of the 1,000 foot limit, right? Even in that C2? Yes, I believe what you're referring to was the zoning administrator, Ms. Likes, letter to plaintiffs counsel at the time, Mr. Sourtag, that informed him initially that there was a disqualifying use within a thousand feet, not specifying what the specifying that it was a multi-use trail. That is a position that she specifically retracted from at her testimony at the preliminary injunction hearing. Under examination she indicated that it wasn't the trail itself which she regarded as a disqualifying use, but rather the trailheads where there would be park benches and other similar amenities that she regarded as a public gathering place that would disqualify the use. But there were no trailheads within a thousand feet of the premises were there? That's correct. She also confirmed at the preliminary injunction hearing her testimony that there are no trailheads. So when Showgirl announced this intent to operate in Angola, it was completely in line with the existing zoning ordinance and that it seems was the problem. Well the existing zoning ordinance also contained the residential buffer zone? It contained a buffer zone from residential zoning districts. But not from a residence? Correct. And is there a difference in terms of how the local laws apply here? I mean I assume that all residences in the city are in a residential district. Your Honor, that's that's not correct. You can see the C2 zoning classification in the maps that are attached as pages 23 to 28 of document 43-2. However, this area town is a C2 medium to large general commercial area and there are at least residential structures there and it's it's a matter of contention of whether anyone actually lives in those structures or if whether they've lived in them in some time, but there are houses within 750 feet. Probably non-conforming uses grandfathered in? That's correct, Your Honor. But at the time that your clients purchased the property, the only buffer zone was this thousand foot from public gathering place or a thousand feet from a residential district line, right? That's correct, Your Honor. And that's what changed with the licensing ordinance? Yes, with the licensing ordinance, well two things changed. First, there was the which is undefined in the code and then the actual operation of that ordinance was to prohibit any land in the city of Angola's boundaries from being used for a adult business. And this is a condition that persisted for approximately 60 days until November of 2012 when the UDO amendments were enacted. Maybe let's avoid the inscrutable acronyms. We've got an old zoning ordinance that was in place in 2008 and we've got a new zoning ordinance that came in in 2012 in response to your client's activity. Yes. And then we've got a licensing ordinance. Yes, which we contend is a zoning ordinance just to make things more clear. Right. Okay, so the new requirements of the licensing ordinance are the 70 or and then a temporary moratorium pending further regulation, apparently. In effect, yes. The temporary moratorium was not stated, it was just simply the practical effect of the ordinance was to prohibit businesses from anywhere in the city that was submitted by way of plaintiffs experts McLaughlin and by the McLaughlin affidavit, McLaughlin and Fernandez affidavit, which examined the previous Angola development ordinance in combination with the licensing and regulatory ordinance. And upon enactment of licensing and regulatory ordinance, no sexually oriented businesses were permitted anywhere in the city of Angola. That's not true now though, is that correct? The city asserts that that's no the development ordinance was amended two months later, it moved the zoning classification from C2 to I2 and the city asserts that there are I2 spaces available that meet with all of the dispersal requirements. But the fact is what you have is you have a business that came into town where the town had already prepared for this circumstance and upon learning that this was actually coming into town, they proposed a emergency ordinance to prohibit businesses within 750 feet of residences. The City Council used special procedures to make sure this was enacted in one City Council meeting rather than three City Council meetings. Even the district court acknowledged that the timing of this was suspicious. And what we have here is a business that and the zoning classification that this business purchased was one that was issued through the legislative judgment of the city of Angola. Now this public gathering place, am I correct that there was a proposed running bike trail that was supposed to begin construction in the spring of 2013? At the time of the, in August of 2012, it was proposed but not yet constructed and that's the public gathering place that has since been confirmed that the zoning administrator does not regard the trail itself as a public gathering place but only the trailheads and there are no trailheads within a thousand feet of the proposed. And is that running bike trail, does it exist now? I believe there's been more construction on the trail, I don't believe it's complete now. As it currently stands there are no trailheads. No trailheads. There's no trailhead within a thousand feet, correct your honor. And were there any permits or anything, building permits, other things that you had to get along the way, your client had to get along the way as he was going forward with the reconstruction? Under the existing, under the prior, yes, Angola Development Code, the Section 5.66 to get a development or improvement location permit because it was a sexually oriented business. You say it was acquired, when was this? It was required, not acquired. Well this was, I mean your client got this at an auction? Correct. At that, from that time forward, did he or she have to get any kind of permits to go forward with the reconstruction? The showgirl was required because, one, because it was a change of use under Section 9.05 of the Uniform Development Ordinance and because it was a sexually oriented business under Section 5.66 of Uniform Development Ordinance to obtain a improvement location permit as a precondition to changing the use classification. So he got all of those then? That was applied for but that was never obtained. And you have to understand the circumstances that we're in. They close on the property within four days, the city has passed the licensing and regulatory ordinance which prohibits the use from being at the subject location. And that's part of the non-conforming use rights argument is that plaintiff wants to, excuse me, the city wants to blame the plaintiffs for not applying for and obtaining the improvement location permit. But the fact is, within four days of plaintiff acquiring the property, they had, the city had already passed an ordinance which precluded him from operating a business at that location. Certainly the next step was not for him to... Well, he can operate a business, he just can't operate this kind of business. Operate the desired business, correct, Your Honor. And... They then went ahead with, you know, what, four hundred, five hundred thousand dollars of improvements with no apparent approvals from any regulatory authority. Your Honor, three hundred and fifty thousand of that was the purchase price of the premises. All right, so that's, that explains that. So the rest is, I don't know, what, a hundred thousand? Yeah, over a hundred thousand dollars for a metal roof and for interior work, for parking lot work. And it was the plaintiff's intention to essentially do as much as they can under the current conditions. And as set forth in the brief... You're talking about the weather conditions? Under the, well, under the legal conditions. Well, they didn't get any more permits though. Correct. They applied for a permit, an improvement location permit, eventually in October and that was not, it was not given until later. But the, I mean, plaintiffs were working with the zoning, or excuse me, the building inspector the entire time and verifying that they were going to be able to do what they wanted to do. Because as you, as you recognize, Your Honor, this property was purchased at auction. This is not something where the party came in with a building plan ready to go. There's... Well, and no choice in when you buy it. Exactly. You show up at the auction or you don't get it. Exactly. All right, so you're under the gun for that. But then they went forward full speed ahead, it sounds, even though you applied for things, or they applied for things. Well, I wouldn't say... Is there sort of a risk there that without getting the final approval? You said the building inspector, I assume he, but I know he only says he showed up once, but I guess there's a question back on that. Yes, his testimony is very suspect as the cross-examination demonstrated. The day he says he issued his stop work order, his emails of that same day make no mention of the stop work orders, so his testimony is very suspect in that matter. He also believed that Showgirl was going to be a steakhouse, and upon cross-examination was very evasive when his testimony was pointed out to him that he inspected a wall for a dressing room, for a women's dressing room. So the zoning administrators, or excuse me, the building inspector's testimony, there's more likely than not and definitely a reasonable chance that the jury would believe the plaintiff's side of the fact, not the jury's, excuse me, not the city's side of the fact. If we grant your relief, then would your clients then continue to build out, I mean the merits haven't ultimately been decided. The district court ruled on certain motions already, but the merits, there's still one claim left, right? Yeah, the alternative avenues claim is still in the court. Right, so if we reversed it, would you then, would your client start building again or continue building? Most likely yes, Your Honor. I need to clarify what exactly is before this court properly. You refer to this alternative avenues claim, that's just part of the First Amendment claim, right? I mean it's not a freestanding claim. We've got a lot of theories that are asserted here, but it's just one First Amendment claim. Yes. And so to the extent that the district court entered judgment on the pleadings, I'm not quite clear on what that was, and the order of the court is not clear about what that was. Although the court does say that there's this alternative avenues claim that remains live, but that's not a separate claim, that's just the last step in the First Amendment analysis. Certainly, well it's one step if, I mean certainly if the district court determines that the ordinances fail to provide adequate alternative avenues of predication, they can be struck in that ground. The purpose of writing those in the preliminary injunction challenge was to show that the ordinance was content-based. If the first inquiry under Renton is, does this ordinance ban all speech in the municipality, and the answer here is absolutely yes. Well absolutely no, though it's permitted in the I-2 district, and so we've cleared that first step of the Renton and Alameda books analysis, and we're now in the secondary effects part of the analysis, and then potentially in the narrow tailoring and alternative channels of expression final step of the analysis, but that's all just part of the doctrinal test that applies. These are not separate claims on which judgment on the pleadings can be entered. You don't enter judgment on a step in the constitutional analysis. Well, Your Honor, as far as the relevance of the I'll disagree with you that there are alternative avenues available because of the... My question is whether that was contested. All we have before us now, this is an intermocketory appeal of a denial of preliminary injunctive relief. We don't have the motion for judgment on the decision on the judgment on the pleadings before us. We don't have the state law claims before us. We don't have the decision on striking the amended complaint before us. All we have is the preliminary injunctive relief, and I'm trying to clarify what exactly was litigated on that motion. The district court's decision on that part of the package of motions that the judge had before him is about a page and a half long. Your Honor, to make the answer simple, the alternative avenues of communication argument was part of the preliminary injunction motion that was presented below. And was it contested, or were there concessions about that? Well, there were concessions. The city basically does not disagree that between the enactment of the licensing and regulatory ordinance and then the subsequent amendment of the zoning ordinance, that there was no where. That doesn't matter. We don't parse the claims that way. The fact that there was a temporary moratorium is not actionable. There's no standing to is that these uses are permitted in a different district, and so the question becomes whether the change of zoning is actionable on your part, and whether these other conditions, the buffer zones, etc., are actionable as First Amendment violations. That's what I'm trying to clarify exactly what the focus of the preliminary injunction hearing was. It is, well, the preliminary injunction hearing involved a number of issues. The relevance of the alternative avenues issue here is, in part, under the third prong of O'Brien, where it's the city's burden to show that the ordinance was not enacted with a effect to suppress, or with a purpose, excuse me, it's their burden to show that the ordinance was unrelated to the suppression of speech. And when you have a city that has an existing zoning ordinance, where they consider this type of use, and they put it exactly where they wanted, and they put dispersal requirements to protect the public, and then as soon as a business seeks to locate there, they enact a moratorium. That's a situation that neither of the Supreme Court cases address. But to call it a moratorium is misleading. It was temporary until the new ordinance was adopted and came into effect. So there's nothing to litigate there. There's no injury from that two-month stoppage. What we have is an injury associated with the new set of regulations that your client is operating under, both zoning and otherwise, licensure, etc., that prevent your client from using the property in the way he wants to. Right. It's the plan's position that the circumstances under Lukumi and under the third prong... Lukumi is not a protected religion case. We've got minimally protected sexually explicit expression here. This is sort of on the perimeters. Yes, Your Honor, but respectfully, what we need to look to Lukumi for is determine what this Court should look at when it's determining whether an ordinance is unrelated to the suppression of speech or not. Lukumi just doesn't apply. That's a different doctrine. We're in the Renton and Alameda Books doctrine, and we've got lots of case law in this circuit on how to apply that, and it's all about the secondary effects test and how the Kennedy proportionality balancing test applies, and then whether there are adequate alternatives left open so that narrow tailoring is satisfied. And it looks to me like none of that got litigated at the preliminary injunction stage. It was not... You weren't... I mean, there was some activity about the extent to which the secondary effects test would be litigated on the preliminary injunction motion, and I'm a little unclear about what happened, but it looks like... I see my time has expired. Would you like me to continue in answering that? Oh yes. Okay. You need to answer. You need to answer. Fair enough. Okay. At the District Court, the defendants proffered the secondary effects evidence to the judge, and plaintiffs said we're not contesting the secondary effects for the purposes of this, and that's secondary effects under the second prong of O'Brien, whether or not this ordinance meets a... or furthers a substantial government interest. It's a different question of whether or not the ordinance is unrelated to suppression of expression, and when you look at the sequence of events here leading up to it, it's pretty clear that this ordinance was enacted to prevent this business from operating. They wanted to stop it from operating in this place, and they enacted a moratorium which prevented this business which wanted to operate a business from operating anywhere in the city for two months, and then the city turns around and blames the plaintiff for not taking more of their non-conforming use rights. But to get back to the question, these issues were recombined by the District Court judge when he says even though after the stipulation was made below, the defendants withdrew their proffer of the secondary effects material, and the judge made it very clear, if it's going to be on the preliminary injunction record, I want it right here so that you're not pointing to something else in front of the Court of Appeals that you haven't put in front of me. And the proffer was made, the stipulation was made, and the proffer was withdrawn. And then making his decision, the District Court said I looked at the secondary effects evidence, and because I think this reasonably supports the type of regulations that were enacted, I find that these aren't content-based, that there was no elicit motive, that there was no, or that the ordinance was not unrelated to suppression of speech, and that intertwined the arguments and made them relevant here. Because whatever evidence the city submitted below it did not present evidence that supported that these establishments needed to be moved from C2, outside the classy parts of town, to I2. Right, and I don't know how this claim can be decided without that evidence. So I'm baffled as to why the parties took it off the table and then the District Court judge put it back in. That mystifies me, because that's the core question under Renton and Alameda books about how to evaluate these challenges, whether the secondary effects is the driving force or whether there's a speech suppression motivating factor, primary motivating factor. And plaintiffs expected to have the opportunity to litigate that below, but for purposes of preliminary injunction, when you have the voluminous studies, as your honors have seen from the record, the ability to get a preliminary injunction where the plaintiffs challenge every one of those things is a Herculean task that makes a preliminary injunction motion. Right, but that's the legal standard that you're up against, counsel, and if you take, I mean if you stipulate it away, then you're not going to get your preliminary to grapple with that at the preliminary injunction stage to prove that you have some likelihood of success in the merits, otherwise you're not going to get that preliminary relief and it's going to go to the merits at a trial or summary judgment maybe. Your Honor, my time has expired. I'd like to have some time for rebuttals. Yeah, I'll give you a couple. You've had a lot of questions. I'll give you a couple more minutes for rebuttal. Thank you, Your Honor. All right. Mr. Burkle. And I'll add a few minutes right from the beginning for you. Thank you, Your Honor. All right. May it please the court, Scott Burkle on behalf of the athlete of the City of Angola. We ask this court to affirm that the district court did not abuse its discretion in refusing to enter a preliminary injunction that would allow a sexually oriented business to open directly adjacent to residential homes, and we think that the record is clear. I want to start with Judge Sykes' question on the confusion about what was in the record at preliminary injunction. I think I can clear it up. Prior to the preliminary injunction hearing, the motion for judgment on the pleadings and all the secondary effects evidence that was attached to the city's answer was fully briefed and basically was not part of the argument, but it had been fully briefed by both sides. When we got to the preliminary injunction hearing, the city, knowing that they had made this claim in their complaint, was ready to present all the evidence of the legislative record. It's the other side's complaint. Yeah, I'm sorry, in the complaint against the city. The city was ready to present that evidence. The plaintiffs objected to the entry of that evidence, and then they entered into the stipulation that is spelled out in our brief, and they said we're not going to do that for the preliminary injunction stage, and we said okay. They made a tactical decision, and that tactical decision was that they would win on the judgment on the pleadings, because that's a higher standard, and they thought, well we can't lose on that. That's going to be part of another motion, and so what happened is the district court, when it entered its omnibus order on January 2nd, dealt with the judgment on the pleadings and dealt with the secondary effects material in the context of that motion, which is not here as part of appellate review. Plaintiffs presented no evidence, so there's nothing to be done as far as reversal on the preliminary injunction ruling, because the plaintiffs didn't, they withdrew their claim. They weren't making that part of their preliminary injunction motion. I'm not sure that's a withdrawal of the claim. No, it's not a withdrawal of the claim. It's just a withdrawal of pressing that grounds for preliminary injunction. That's what they did at the hearing, and that was fundamentally clear, and so when I was proffering the evidence, the judge said... It's not a separate grounds for preliminary injunctive relief. It's just part of the First Amendment claim, and again, I'm baffled as to why it was stipulated away. The way that the presented it, they presented it as like a separate and discrete claim. None of these are separate and discrete claims. We have one First Amendment claim, and then we have a bunch of state law claims, and there's a whole bunch of different First Amendment theories kicking around in this case, but the primary one is the Renton Alameda Books claim, which has a very, you know, long-standing framework for evaluation. That's correct, and so the plaintiffs said, well, we're not going to press that. However, they parsed it out, and the judge said to me, does that affect your proffer of all this evidence? And I said, sure, we'll take the stipulation that that's not part of the preliminary injunction, and the judge said, well, you know, I have these other motions, and it's part of the other motion, and I said yes. So they can't seek a reversal here because they're bound by their stipulation. I think that's just the simplest resolution of that, but basically... But the judge then inserted that issue back into the preliminary injunction decision, which was very much an afterthought in this omnibus opinion. The judge resolved all these claims on both the state law claims and the First Amendment claim, or purported to, on a motion for judgment on the pleadings, which is incorrect in this context. Maybe some of the state law claims can be resolved that way if they present pure legal issues, but the First Amendment claim cannot be resolved in a motion for judgment on the pleadings, and the judge seemed to parse it out into separate claims based on the different steps in the First Amendment analysis, and that's improper. Your Honor, I would agree to the extent that the judge framed his opinion according to the way the plaintiffs litigated their claims, and that structure was probably not the best. Well, no, there was one First Amendment claim. That's correct. With a bunch of different theories. That's right, and when they moved for preliminary injunction, they made the heart of their claim not related to that. In other words, they had headings and breakdowns in their motions and briefs, and I can't defend the way the district court wrote the order or the way the plaintiffs structured their claims, but they withdrew. They said, whatever the judge entered judgment on the pleadings on. If I can grab the district court's order. Well, I've read it. I can't figure it out. I believe that he entered judgment on the pleadings, as it pertains to this issue, on the idea that the city relied on evidence reasonably believed to be relevant. That's just one step in the First Amendment analysis. You can't get judgment on the pleadings on a step in the First Amendment doctrinal analysis. Okay. Is that what you asked for? No, we asked for judgment on the pleadings on the whole case. Well, we asked on judgment on the pleadings on everything but the case, and the reason for that was all the exhibits necessary for that were part of the pleadings, except the affidavits about alternative sites, and that was something that we moved for summary judgment on the issue of alternative sites. Yeah, but that's really not true, though. All the evidence on secondary effects can't be part of the pleadings. That has to be put in an evidentiary way. Your Honor, under the case law that we cited to the district court, there's a Sixth Circuit published decision and numerous appellate decisions that do grant judgment on the pleadings because it's a legal standard of whether evidence is reasonably believed to be relevant. The Supreme Court has told us what meets that standard. Right, but that's not the whole case. That creates a sort of a case and then Justice Kennedy's opinion for the concurrence, which was the deciding vote in the case, we've said that that's the holding and the standard that needs to be applied, and it's this proportionality idea that, you know, secondary effects, once the city's reliance on them is established in an evidentiary way, then there's an opportunity to challenge that and there has to be some proportionality between the reliance on secondary effects and the amount of expression suppression that's going on in the case. Your Honor, I understand your position. The district court's order, you know, it's as clear to you as it is to me. Right, but that's what formed the basis of the denial of preliminary injunctive relief, and I get that we're not reviewing the motion for judgment or the decision on the motion for interlocutorial order. It's not before us now, but to the extent that the judge based his denial of preliminary injunctive relief on that decision, we've got a problem here because the doctrinal analysis was incorrect and there was no evidentiary basis for what the court did. It was all based on the pleadings. Well, right, I mean the evidence that was taken at the preliminary injunction hearings had to do with the chronology of events. That's right, and with all due respect, we moved for judgment on the pleadings on the secondary effects issue and we contended under the Sixth Circuit's decision, Sensations versus City of Grand Rapids and other appellate authorities. That's not the law in this circuit. We require evidence. That's correct. You can't get your judgment on the pleadings. That is correct, Your Honor, and the GM Enterprises and the Bar case both went off on summary judgment, but they went off in such a way as those decisions said, here's what meets the legal standard under Renton, and if a city does exactly that exact same thing and meets the legal standard of Renton by relying on the same evidence. Yeah, but the other side gets to challenge that on pretext grounds and on this proportionality idea to the extent that it's understandable. Your Honor, could I move on to just two quick additional, and I understand the court's position. We believe that their preliminary injunction, although this court may make statements in its opinion about the propriety of the judgment on the pleadings, it doesn't seem to be a ground for reversal because they said they weren't going to press that, and that was the position they took, and we had no reason to oppose the plaintiff saying we're not going to argue this, but all their arguments about secondary effects and claims of pretext, they really go under the Renton and O'Brien standard that, as Your Honor noted, is very well established in this circuit, and that is that the court will not strike down a law that's otherwise constitutional based on an alleged illicit motive, and that's what all the arguments here are timing. They run up against that black letter law, but more importantly, they ignore the history in the city of Angola of regulating adult businesses to protect not just residential districts, but also residential land uses or single-family dwellings and better commercial areas, and in this court's decision in Blue Canary, the court said countless cases allow cities to zone strip clubs and adult bookstores out of residential areas and classier commercial areas. Do we know anything about the justification for changing the zoning classification? Well, all of the secondary effects evidence talks about the outflow of negative impacts on the communities, decreased property values, and they were seeking to protect residential uses. Right, that has to do with the buffer zone. That's right. But what about the zoning reclassification from C2 to I2? It also has to do with the zoning classification as well, because inherently industrial zoning tends to be less closer to residential land uses. Do we have a record on that? We do. This is quoted at page 5 of our brief, where the city's rationale for adopting the 2003 ordinance is laid out in great detail about the need to protect areas that single-family dwellings and the need to protect commercial areas. It talks about findings from the merchants in the city about wanting to protect the commercial areas. And so, all intents and purposes, the only evidence in the record, and it's undisputed, is that when they hired this outside consultant for an overhaul in 2008, all their policy statements that they made in great detail in their 2000 ordinance got overlooked, and when they did this shift, they failed to include the residential buffer that they had always had. In fact, they had had a buffer of a thousand feet. So they want to make this end to be an impermissible purpose, but in addition to running into the motive issue that rents and forecloses, they also run into the historical fact that the city was just, even if it prompted, even if their arrival prompted their notification of a loophole, that, oh, what happened to the residential buffer? Not just the residential district, but the ones for homes, for single-family dwellings, and this use is directly adjacent to, or within, directly adjacent to one and within 750 feet of several homes with families. Was the 2008 revision of the zoning code a comprehensive revision? It was basically an outside consultant coming in and overhauling it. The whole code? The whole code, yes. And what happened was, that's my understanding. I don't know that that is in the record, but the planning and zoning administrator said, I looked for all the, any rationale for this change from what we had always had going back a decade to 2003, and it appears to have been an oversight. But it wasn't an illicit motive, and Plano's real argument here is, as you noted, is not that there's not alternative avenues of communication. They do not dispute that presently there are 41 parcels on more than 110 acres. Instead they have, as you mentioned, an inchoate challenge to this 12 days after they submitted an incomplete application under the old zoning. But they never suffered an injury under that old zoning, because they never had a completed application. Their whole, and the reason that the party's evidence on the alternative sites is ships passing in the night, is because what they pled was only a claim that there are insufficient sites in the status quo, in the present. And this is at paragraph 246L of the complaint. They basically said it fails to leave alternative avenues of communication, and they say the ordinances do that. And when you go back to paragraph 62 of the complaint, it tells you what they mean by the ordinance. That means the licensing regulation and the new zoning. And that's all they pled. So when the city moved for summary judgment, they put on evidence on the claim that was pled. And they concede by not responding to the motion for summary judgment, that they weren't, that that they don't have any evidence on that issue. That there's plenty of sites in the present. They want the court to go into an inchoate span of time where they never submitted a completed application and strike down a law that's been appealed. But the more important issue is they did, as Judge Mannion pointed out, they engaged in a host of illegal activities during that time. And that record from the district court is well supported, that they never engaged in a building permit process. Even though they were told multiple times they had to get a building permit, they never did that. Indiana law is clear that you can't have a vested right to be treated under an old law when you were operating illegally, when you were violating a building permit. That's the Plaza Group case, that's the Dandy Co. versus City of South Bend. So there's a number of cases on point with that. Are those issues really properly before us? Yes, because they're the crux of the plaintiff's theory on alternative sites at the preliminary injunction. They said you have to consider, you can't consider the new ordinances. Well no, that part, but the vested rights claim, the state law claim for violation of vested rights, that's a state law claim, the court did enter judgment on the pleadings on that. The analysis overlaps because you don't have a way to get back to challenge this repealed law unless you have a vested right to be treated under it. And that's why their whole argument of alternative sites is just that for this period of time, this temporary, what they call moratorium, which was not, this temporary period of time they claimed there was a lack of sites. But they do that by combining the licensing ordinance that had the residential buffer with a zoning ordinance that was never applied to them because they never submitted a application. Well they can challenge it facially. They could. Because they're injured by it now. They could challenge the current ordinance on its face. Right, we've got a live claim for challenge to the current ordinance, the zoning ordinance, and a live claim for a challenge to the licensing and regulatory ordinance. That's right. It's the old ordinance that now has been replaced that is a question mark. That they don't have standing on and that is relevant to lengthen their appeal because they're arguing, oh there was a period of time, even though we never submitted the applications and we were illegal because we were violating the building permit process throughout our construction that was unlawful under Indiana law, but they're saying nevertheless we want to reach back in time and attack that old ordinance. But they have no standing on it. But on state law grounds, not on federal constitutional grounds. Well they're trying to say that if we can show that during this inchoate period of time from the day that we submitted our incomplete application on November 7th under the old zoning to when it got amended to open up the I-2 on November 19th, if we could reach back in time and attack that, if we have some kind of vested right to do that, then we can strike down the old ordinance and somehow say there was nothing there. It's very, it's several levels, four or five different levels of this had happened and we had submitted a complete application, but they never did. In the final analysis, the district court did not abuse its discretion on the record that was in front of it. That first of all, the city did have a legitimate grounds for regulating adult businesses. It wasn't the first ordinance, they had it for years. That there was no entitlement to a preliminary injunction on the First Amendment claim and that they lack standing to challenge various permitting requirements. One, because it was never applied to them, and the second because a facial challenge didn't lie to a generally applicable improvement location permit requirement that applies to every land use in the city. And so for all the reasons that were stated in our brief, and one of the things I thought I would point out is there is a timeline in the record that sort of helps with some of this. It's at, in the appellate PDF that is R36-4 and it lays out some of the timeline issues relative to this that's helpful and it bears noting that they did already have an appeal before a hearing officer in state court that said you had no vested right and so on and so forth. And for those reasons we ask that this court would affirm the decision below to not enter a preliminary injunction. Thank you. Thank you. Counsel, you have two minutes. Your Honors, Judge Sykes, I wanted to address the relevance of the what the city calls the NCOA claim and I wanted to point the court to the Augusta video decision out of the 11th Circuit because the issue we have here is we have a city that enacts a de facto moratorium upon learning that this business is coming to town and then turns around and blames this business for not applying for permits and not undertaking more activities to achieve vested rights status when it's the city itself that made it very clear that they were never going to let this business open up anywhere. And what the Augusta video decision did is it looked back to a period in time where there was a prior restraint in place and said even though this isn't the state of affairs now we have to look at whether this was constitutional during this period in the past for the purposes of the vested rights analysis and that's what we have here. Plaintiffs cannot be held to have not met the vested rights status because simply because they didn't do anything when it was the city that completely prohibited them or at least discouraged them from doing anything by enacting these ordinances. And I also want to, while I have the opportunity, address the shifting criteria prior restraint claim and that I'm asking this court to essentially adopt the approach of the Court of Appeals in the California Court of Appeals in Gamoa that looked at a city which had a applicant for a sexually oriented business before it and during the application process changed the criteria so that the zoning classification no longer counted for the business. The California Court of Appeals looked to FWPBS versus Dallas and City of Lakewood which says if you, when the city is or when the government is enforcing shifting or illegitimate criteria you can't tell, I see my time is up, shall I finish? You can finish your thought. When the government uses shifting criteria, the problem is that it's too difficult for the court to determine whether or not the determination was content-based or not. Here, whether or not the city's decision to change their zoning ordinance or not, whether that's content-based, it's very difficult to determine post hoc, but that line of cases says we don't need to look there because changing the rules mid-process gives us that risk. Thank you, Your